Verdict for plaintiff.

---

### RUTZ *v.* SEEGER *et al.*

(*Circuit Court, S. D. Illinois.* February 11, 1888.)

RIPARIAN RIGHTS—AVULSION—ACCRETION.

A portion of plaintiff's land situated on the eastern bank of the Mississippi river was washed away by rapid and perceptible stages, and lodged in the river opposite. This occurred during the spring floods, a strip of land from 250 to 300 feet in width being carried away each time, which could be seen in its progress.· Blocks and masses of earth from 10 to 15 feet in width frequently caved off and fell into the river, and were carried away. *Held.* that plaintiff was entitled to as much of the land as formed in the river by this process between the adjacent shore and the thread of the river, together with accumulations caused by the gradual washing away of an island above plaintiff's land, and which was deposited and filled the space between the shore and the new formation in the river.[1]

At Law. Ejectment brought by Edward Rutz against Benjamin Seeger and the city of St. Louis.

*Edsall & Edsall* and *R. A. Halbert,* for plaintiff.

*Levereet Bell* and *William C. Kueffner,* for defendants.

GRESHAM, J. This cause having been heretofore, to-wit, on the 10th day of November, 1886, in pursuance of the written stipulation of counsel for the respective parties on file herein, heard and tried by the court, without a jury, and the court having considered the evidence, including the admissions and agreements as to facts made by the respective parties upon the trial, and having also heard the arguments of counsel, thereupon took the case under advisement. And now, on this the 11th day of February, 1888, the court, being sufficiently advised in the premises, doth find the following facts:

1. That in the year 1849 one August A. Blumenthal acquired and· then owned the title in fee to surveys numbered 149, 150, 151, 152, 153, 154, 155, and 156 of the common fields of Prairie du Pont, in the

---

[1]For a discussion of the doctrine of alluvion, avulsion, and accretion, see Serrin v. Grefe, (Iowa,) 25 N. W. Rep. 227, and note; Mulry v. Norton, (N. Y.) 3 N. E. Rep. 581, and note.

county of St. Clair, in the state of Illinois; and that Edward Rutz, the plaintiff in this suit, acquired from said Blumenthal his said title to said land prior to the commencement of this suit.

2. That the map or plat made by G. F. Hilgard, county surveyor of St. Clair County, Ill., produced in evidence and marked "Plaintiff's Exhibit B," is a correct map and plat of said premises, and of the several surveys and lines indicated thereon; which said map is included in and made a part of these findings, and to which reference is had for greater certainty.

3. That it appears from the evidence, field-notes, and plats in evidence that said surveys, numbered 149, 150, 151, 152, and 155, are each one arpent, or about 12 rods, in width, and the said surveys 153 and 154 are each two arpents, or about 24 rods, in width; and that the said survey numbered 156 is three arpents, or about 36 rods, in width; and that the said several surveys adjoin each other, and lie side by side in the order the same are respectively numbered, survey 149 being upon the extreme northerly and survey 156 being upon the extreme southerly side of the entire tract; and that each and all of said surveys extended to and are bounded by the Mississippi river on the north-westerly ends thereof, and extend south-easterly from the Mississippi river, the average distance of about 1,000 rods to the hills or bluffs on the Illinois side of said river.

4. That the said title of the said Blumenthal to said lands so acquired and held by the said plaintiff is derived from and based upon the title, and claim of the inhabitants of the village of Prairie du Pont, mentioned in the report of the commissioners, Michael Jones and E. Backus, dated at the commissioner's office, Kaskaskia, December 31, 1809, read in evidence from volume 2, the "American State Papers—Public Lands," commencing on page 167 of said volume, and which report was confirmed by section 3 of the act of congress of February 20, 1812, entitled "An act for the revision of former confirmations, and for confirming certain claims to lands in the district of Kaskaskia," contained in 2 U. S. St. at Large, 677, 678. And it appears from the said report of said commissioners that the tract of land therein described and awarded to the said claimants as inhabitants of the said village of Prairie du Pont, together with certain land awarded to the inhabitants of the village of Cahokia, was "bounded on the west by the Mississippi, including the adjacent islands, beginning a quarter of a league above the little river Caho Kia, and extending south and east for quantity so as to contain a tract of four leagues of land square."

5. That said Blumenthal, in the year 1849, after he had acquired title to said surveys in said Prairie du Pont common fields as aforesaid, took possession under his deeds of the property mentioned in said surveys; and that his actual possession never extended further west than the eastern edge of the Mississippi river; and that the plaintiff, Rutz, succeeded to the possession of said lands of the said Blumenthal prior to the commencement of this suit.

6. That the premises described in the declaration, and sued for, are located at the present time, and were at the commencement of this suit,

eastwardly of the center of the main channel of the Mississippi river, in the county of St. Clair, in the state of Illinois.

7. That there was no dry ground formed in the Mississippi river in the year 1850, in front of the water's edge, as it then existed, opposite to the said land of the said Blumenthal, on the main shore.

8. That, as appears from a survey of said lands made by William Deneen, as the county surveyor of St. Clair County, Ill., on November 15, 1850, at that time, the dry land of said surveys numbered 149 to 156, inclusive, extended westwardly to the line indicated by the words, "River Bank, 1850, by Deneen," on the map marked "Plaintiff's Exhibit B;" and that the main land of said surveys, numbered 149 to 156, inclusive, in the year 1850, extended westwardly over and across and included about 60 rods in width of the lands described in the declaration, to-wit, that portion of said lands lying between the river bank in 1850, as indicated by said Deneen's survey, and the line marked "Old Surveyed River Bank, 1814," as said lines are respectively designated on said map, and that in the year 1863 the main and dry lands of the surveys 149 to 156 extended about 15 chains, or 60 rods, further westward, and beyond the line of the river bank so surveyed by said Deneen in 1850; and that the eastern bank of the river, in 1863, was about one-half a mile west of a dwelling-house, hereinafter mentioned, then standing on survey No. 151.

9. That the greater part of the so-called "Arsenal Island," which now extends over and is embraced within the boundaries of the land described in the plaintiff's declaration, is located upon the site of the dry land of said surveys numbered 149 to 156, inclusive, as the same existed from 1850 to 1863; and that the residue thereof, being about one-eighth of the entire width of the same, is located upon the bed of the Mississippi river as it then existed, and lies easterly of the thread, or middle line, of said river.

10. That between the years 1863 and 1873 the river front of the said surveys numbered 149 to 156 was washed away, so that in July, 1873, the river front of said lands only extended to the line marked "River bank, 1873," on said map; and that said river bank thereafter continued to wash away, and cave in, until it reached the line marked "River bank, 1884," on said map.

11. And the court further finds from the evidence that such washing away of said river bank did not take place slowly and imperceptibly, but, on the contrary, the caving in and washing away of the same was rapid and perceptible in its progress; that such washing away occurred, principally, at the rises or floods of high water in the Mississippi river, which usually occurred in the spring of the year; that such rises or floods varied in their duration, lasting from four to eight weeks, before the waters of the river would subside to its ordinary stage or level; that during such floods there was usually carried away a strip of land from off said river bank, from 250 to 300 feet in width, which could be seen and perceived in its progress; that blocks or masses of earth from 10 to 15 feet in width frequently caved off and fell into the river, and were

carried away; that in the spring of the year 1872, Mr. Blumenthal, the occupant of the land, lived in the dwelling-house situated on survey numbered No. 151; and the river had previously encroached upon the land, so that the house was then about four or five hundred feet back from the river bank and water's edge, as it then existed. When the spring rise or flood occurred that year, the said Blumenthal became alarmed for the safety of his house, and immediately commenced taking the same down, and removing the same further from the river bank, and in so doing worked for four or five days in succession, at the expiration of which time the bank had caved in and washed away so rapidly that the bank and waters of the river had approached within 20 feet of the foundation where the house stood, before the waters subsided, carrying away the greater portion of the foundation of the house; that such caving in and washing away continued until the building of the dyke on the eastern side of the river above said lands, by the United States government, in the year 1876.

12. That the said washing away of bank on the front of the said surveys was caused by dykes built by the city of St. Louis, on the western side of the river, at the points where the same are indicated on said map, causing the current of the river to flow over to and against the eastern shore, and against the lands of the plaintiff; that the western bank of the river, opposite the plaintiff's land, is rocky, and there appears to have been no material change in the same since the first survey thereof by the United States government.

13. The court further finds that in 1853 there existed an alluvial formation, or body of land, on the western side of the river, near the Missouri shore, then called "Quarantine Island," which, in that year, 1853, was surveyed by William H. Cozzens. The location and boundaries of said island is indicated upon said map, the same being shaded in red, and having written thereon the words and figures "Quarantine Island, also called 'Arsenal Island,' as surveyed in 1853." In 1858 said island, in low water, extended to and adjoined the main land on the western or Missouri side of the river. At some times between the years 1853 and 1863 the greater portion of said Quarantine island washed away so as only to leave remaining that portion thereof embraced within a second survey thereof made by said Cozzens in January, 1863, the location and boundaries of which are indicated upon said map by the words "Survey No. 411, of St. Louis lands, school lands, Arsenal island, as surveyed in 1863;" the letters and lines there being shaded green upon said Exhibit B.

14. Said Quarantine island, since its resurvey in 1863, has been called "Arsenal Island," and at the time of said surveys, in 1853 and 1863, the same was situated on the west side of the main channel of the Mississippi river, and about two miles further up the river than the lands described in the declaration; and no part of the same then extended down the river opposite the plaintiff's lands.

15. On February 10, 1863, a part of said island designated as "Survey No. 411, of St. Louis school lands," containing 109.92 acres, was

assigned to the St. Louis public schools in pursuance of the act of congress of May 13, 1812, entitled "An act making further provision for the settling claims of land in the territory of Missouri," (2 U. S. St. at Large, 748,) and of the supplementary act of May 26, 1824, (4 U. S. St. at Large, 66,) and the residue of said island, as so surveyed in 1863, being 9.65 acres on the northern end thereof, appears to have been also assigned to St. Louis public schools on August 25, 1864, as indemnity for school lands lost in section 16, township 45 N., range 7 E., of the St. Louis district, Mo.

16. By deed dated February 8, 1866, the St. Louis public school conveyed said Quarantine or Arsenal island to the city of St. Louis, which lands are described as situated "in the county of St. Louis and state of Missouri."

17. The court further finds that there is not now, and was not at the time of the commencement of this suit, any land whatever above the surface of the water in said river on the site or within the boundaries of said island as surveyed in 1853, nor upon the site or within the boundaries of said island as resurveyed in 1863, but the same was wholly washed away.

18. The court further finds that in the floods before mentioned large portions of the upper or northern end of said island washed away; that in the flood of 1875 the entire graveyard, forming a part of said island, was thus washed away; that in such floods a bar formed each year below and joined to the foot of the island, extending down the river for the distance of a quarter of a mile or more; that when the waters subsided after such a spring flood, the surface of such bar appeared in sight above the surface of the water, but nearly on a level with the water; that during the first summer after such a bar had formed willows grew upon it, and the flood occurring the next succeeding spring deposited more sand and soil upon the bar, which was retained by the willows, and the bar so formed was raised higher in each successive annual flood so long as it was overflowed in high water; and this process was repeated at each succeeding flood by the formation of another bar immediately below that formed by the preceding flood, which in turn was covered with the growth of willows, and raised higher by each succeeding flood, or until it ceased to be overflowed.

19. The court further finds that such bars were not formed by accumulations of sand or soil washed up against the lower end of the island, but by deposits, in times of flood, of soil and sediment upon the bed of the river.

20. The court further finds that before said island was washed away the main and navigable channel of the Mississippi river was eastwardly of the island, but that after bars formed lower down the river in front of the plaintiff's land the main and navigable channel of the river has been and still is on the west side of the bars; and that since the said bar or island had so formed in the river in front of said survey the boats navigating the river have not run between the bar and the bank of the eastern or Illinois shore of the river.

21. The court further finds that in or about the year 1876 the United States government built a dyke from the eastern or Illinois shore of the river to the bar or island as it then existed, about 60 rods northerly or higher up the river than the north line of the plaintiff's land; which said dyke is indicated on said map by line having the word "dyke" written beneath the same; and that in or about the year 1878 the United States government built a dam above said dyke from a point near the head of said bar or island to the eastern or Illinois shore, on the line designated "dam" on said map; and that, after said dyke and dam were built, the flow of the water through the channel or space occupied by the water between the said bar or island, which had so formed in front of the river bank of plaintiff's land, as it existed at that time, was thereby impeded, and the channel or space gradually filled up by deposits from the river, so that by the year 1884 the same had become dry land, from the line in front of said surveys marked "River Bank, 1884," to the western side of the land opposite said surveys, as indicated on said map, and that the same has since continued to be and is now dry land; and that the lands described in the declaration embrace so much thereof as lies westerly of the line marked on said map with the words "Old Surveyed River Bank, 1814," and easterly of the middle or thread of the Mississippi river.

22. The court further finds that the lands described in the plaintiff's declaration are situated in the county of St. Clair, in the state of Illinois, and that the plaintiff is, and was at the time of the commencement of this suit, the owner in fee of the said lands described in the declaration.

23. And that the value of the said lands in controversy in this suit exceeds $16,000.